Brock v. Flowers Foods No. 23-1182 We'll close the back door and counsel, you may proceed. Thank you, Your Honor. Tracy Lovett for the appellants, and may it please the Court. As is clear from our briefs, we believe this case can be decided on either state or federal law grounds, but in light of the Supreme Court's intervening decision in Bissonnette, I propose that you indulge me to start on Bissonnette and its impact on this case and the FAA issues. So in our view, Bissonnette had two impacts. The first is it definitively decided the transportation industry argument that we advance against us. We're no longer pursuing that argument. We agree that that's been disposed of by Bissonnette. But in disposing the transportation industry issue, the Court made crystal clear what it means to be a transportation worker. It doesn't matter what the employer does. It doesn't matter what the transaction is. What matters is the worker's work, and the Court clearly articulated the test under Section 1 as the following. The worker must be, and now I'm quoting, actively engaged in transportation of goods across borders via the channels of foreign or interstate commerce. That's at 256. In addition, the Court rejected our policy argument. We made the argument, and this was flower spoons at the Court, that we made the argument that without some sort of industry limitation, Section 1 would be expanded to include anybody who touched a good in its travel, because all goods travel through interstate commerce. And the Court rejected the argument and said we never intended Section 1 to be that broad, citing the exact language that I just quoted to you, also at 256. In our view, that limit resolves this case. Mr. Brock is in no way engaged in the transportation of goods across borders via the channels of interstate or foreign commerce. His relationship with the goods travel is exclusively local. In fact, it's even easier in our view than the Last Mile cases, because Mr. Brock, Inc. takes the title to the bread. It then resells the bread in its own separate transaction to local retailers. These are wholesale distributors. That's an industry. This is what they do. They buy from the manufacturer, they resell locally, and it's an entirely separate business. The goods travel. Sure, the goods travel through interstate commerce. But Mr. Brock and Brock, Inc.'s relationship to it is nothing like the Amazon delivery drivers, and also nothing like Ms. Saxon. In the Saxon case, remember, Ms. Saxon— Well, Amazon delivery drivers don't necessarily cross state lines either. But they never take title. And so I think that's a different case. And that's the test of interstate commerce is taking title? Is that your position? No, our position is you don't need to get to the Last Mile case because this is structurally so different. I don't understand your response. What does take title mean here? Take title means he literally takes title to the bread. That's added. Why does that make a difference in terms of whether he's functioning in interstate commerce? I think if you adopt—all we're saying is it distinguishes him from the Last Mile driver. To get to your question— I'm not understanding your point. Could you expand on that? Yeah, I sure will. So we think the test is exactly as it's articulated in BCNF, which is that you have to look at the relationship between the worker and the transportation of the good. I think the best articulation of the legal test that I've found is in Wallace in the Seventh Circuit. Then Judge Barrett put it as the workers must be connected not simply to the goods, but to the act of moving the goods across state or national borders. So he has to cross state lines. Is that your point? Not necessarily. He has to be actively engaged in the movement. Ms. Saxon didn't cross borders in the Saxon case. But what she did was she put a good directly into the interstate channel of transportation. She put it on a plane that was about to cross state lines. And the court says when you're that close to actually being in the interstate channel, you're effectively part of it. Are you saying that BCNF undoes the written line of cases, or you're just distinguishing solely on the basis of title? Oh, no, no, no. I was just distinguishing Last Mile on the basis of title. I think that BCNF makes very clear what was a little unclear from Saxon. Are there facts that we don't know that we should know before deciding this case? For instance, I don't know if spoiled goods. Who bears the brunt of that? Who bears the brunt of spoilage? Yes. Under the agreement, there is the option for Brocking to return some amount of bread for spoilage. Okay. And so title? So, again, I might have made a mistake starting on title. We think title distinguishes Last Mile. We don't think it's determinative of Section 1. In our view, the key factor is not anything about the goods. It's about the worker's relationship to the transportation channel. What is Mr. Brock doing with relationship to the goods interstate travel? Are we talking warehouses now? No, we're talking about local delivery. What does Mr. Brock do? Do warehouses matter? If you buy the First Circuit's and Ninth Circuit's analysis, if that's your starting place, the traffic of the good matters, then you would think the warehouse matters. We disagree with the First and Ninth Circuit. We don't think the warehouse matters. We think what you look at is what is Mr. Brock's relationship to the channel of transportation, to how the good travels. And here, it's undisputed. It's entirely local. Well, it becomes a new transaction depending on who owns the warehouse, doesn't it? Again, I think there's two rationales here. You can say either we don't need to disagree with the First Circuit or the Ninth Circuit because there are two transactions. Or you can disagree with the First Circuit. But here, the warehouse isn't so clear. In other words, Flowers owns the warehouse. And Brock pays a fee to use the warehouse, is my understanding. So the way this works in practice is the delivery of the goods come from multiple distributors. It's not just from Mr. Brock. So the truck arrives to the warehouse. It's unloaded by that trucker, and different piles are made for different distributors who then come and pick it up. I don't think the record actually says who owns the warehouse, just that there's a fee paid for use. Well, that sounds like a flow or a stream or a journey of commerce, then, to me. The good in the journey of commerce? We're not disputing that the good is in a journey of commerce. But BSNET tells you it's not the goods journey that matters. It's the worker's relationship to the goods travel that matters. And here, the only relationship that Mr. Brock has to the goods travel, his relationship as a class of workers, is the entirely local part. That's it. There's no dispute. He doesn't unload for the trucks that are coming from interstate commerce. Everything is there on pallets ready for him to get to pick them up. At that point, what's his relationship to transportation, to the channel? That's what BSNET tells you to look at. It's purely local. Would the result be different if he did participate in unloading the truck? I think that'd be a harder place because then you're closer to Saxon. But luckily, we don't have those facts here. I can make the argument. Then we'd be in the land of title and that sort of thing. But I think here, it's so clear that his sole responsibility is local transportation that you don't have to get into these questions. So you're saying this case turns on whether he goes and picks up a box and puts it on a pallet? That's going to make the difference? That's the line the Supreme Court's drawn on Saxon. And that's the textual line. And it may not be a satisfying line, but twice in the text of Section 1, Congress made this line. First, in the Justum Generis Principle, by picking railroad employees and seamen and other class of workers. Congress is picking these folks who are engaged in foreign and interstate commerce. The second textual clue you have is the distinction between FAA Section 1 and FAA Section 2. And this is the Supreme Court's decision in Circuit City. That Congress purposefully chose different language in Section 2 and Section 1. Section 2 is the outermost limits of Congress's commerce class power. Section 1, engaged in, is a very narrow scope. It's talking about only people who are actually working within this channel of transportation. We may not understand that line today, but in 1921, what was motivating Congress to draw this line were nationwide strikes. These were the railroad strikes. These were the strikes in the harbors that were actually bringing foreign and national commerce to its knees. You weren't seeing that on the local levels. You weren't having problems with local deliveries. So that's where Congress was drawing its line. I don't understand why you say Saxon drew a line that would affect here. Saxon decided a case. It said, if you load bags at the airport, you're in the flow and stream of commerce. Good enough. It didn't say, if you're an Amazon driver or if you're picking up bread at the flowers warehouse and paying a fee for it and staying in trust state as you deliver it, that you're out of luck. It did not decide that issue. In fact, in both Saxon and Beeson, they expressly reserve this issue. All right. So when you say it drew a line and you make a point of that, what are you saying then? It was to answer Judge Bacharach's question. If there was loading and unloading into the interstate channel here, would that be different? And I think that's the facts of Saxon. So I think at that point, it's not that it's drawing a legal line, but that it's a lot closer to that factual precedent than what we have here. Our argument is this is the case that the Supreme Court's been reserving. But Beeson, that is really the clearest articulation of the way the court's going. And it's over and over again in that opinion. It's worker's work. It's worker's work. What distinguishes the Amazon cases? Title, you said. Yes. And who orders, who the transaction is between? Is that another one? We think that that is a false factor. And you shouldn't be looking at who orders. And because it runs smack into two textual problems really quickly in Section 1, which is first, under Section 1, remember the transportation work has to be that of a seaman or a railroad employee. You still have to deal with the adjustive generous. And that's not customer or ordering. It's not the transportation work that Section 1 gets you into. And then you run into that Section 1 versus Section 2 distinction is what does it mean to be engaged in as opposed to just be part of Congress's commerce clause power? That is the telemarketers, you place the order, it comes in. That's classic commerce clause jurisprudence. Let me ask it this way. If we buy the Amazon cases, the RIPMA and so forth, how do you still win? Okay, that's where I got us off track initially. If you buy into the First Circuit, Ninth Circuit framework, I think we still win because we're structurally and factually different. Because the Amazon drivers never take title. They don't have their own business. They are literally one continuous transportation stream, whereas here you do have a separate transaction. You actually have a separate business that's getting involved, which is a wholesale distributor. So I think I might have got us off track initially, but we're offering that as a distinction on the last mile cases. I don't think you have to disagree with the First and Ninth Circuit for us to prevail. But I think if you want to deal with this bigger question that's out there in splitting the circuits, I think BISONET is the path. I'd love to reserve a little time for a bubble, but there's so many issues I'm happy to keep going. Well, you haven't talked about the issue you raised in your 28J letter. In fact, I thought you might even start with that. Can we call the clock at two and a half when I answer that question? Please. I'm just asking, can I reserve two and a half minutes for rebuttal and then just quickly tell you something about contracting? Why don't you just go ahead and address that question, and we'll see where we are. Okay, sounds good. I do think that the second sort of watershed landscape change that's happened since we filed our briefs is with contract of employment. You now have three circuits, and this is the only place where there's circuit agreement on Section 1. What does it mean to be a contract of employment? Well, they don't all analyze that issue the same way. So when you say circuit agreement, isn't that a bit of an overstatement? I don't think so, because the First, Fourth, and Ninth Circuit are all looking at what it means to be a contract of employment. I didn't say they were not doing that, but their analysis is not identical. Would you agree with that? I would agree that the facts are different, but I think the overarching legal analysis is the same. It's textual. All right, all right. We'll have to look at that. But I guess my question is this. You didn't raise this. You conceded that it was forfeited, correct? We did not raise this as an argument, but we've been raising the fact that this is a business. But what you're asking us to do is to exercise our discretion to reach a forfeited argument, correct? Correct. And we have never addressed that this would be a question of first impression in this circuit. That is correct. And I would only, on behalf of employers everywhere, plead for clarity in this area. And I think this is sort of one of the questions you're going to reach down and take. There's no dispute of fact. We've been raising these facts all along. It's purely a legal question. And there is just a tremendous need for clarity in this area of law throughout the nation. That was our time. Thank you.  Good morning. May it please the Court. Sean Markley on behalf of Andrew O'Brock, plaintiff below, and the appellee here. I'll start with the engagement in interstate commerce, which is where we spent most of the time over the last few minutes here. As an initial matter, I haven't yet answered a very narrow question, which is whether there was this transportation industry requirement. It answered that in the negative. It did nothing to disrupt the most seminal case on this by the Supreme Court, which was Saxon. So I think this is definitively a Saxon case, and we should look at it through that two-step rubric. I don't think step one is an issue. We have an undisputed class of workers who load and unload our bakery products. The question is whether that's adequate engagement in interstate commerce. So does that mean a – let me ask you this. In my leisure time, I work as a paperboy. I get the New York Times delivered, and then I go and deliver it in my neighborhood. Am I a transportation worker? Assuming those papers came in from out of state, as I assume they do with the New York Times, we're here in Denver, Colorado, yes, I think you would be engaged in interstate transportation at that point. Specifically, the customer in this case, the person whose house you're delivering that paper to, has ordered the very good that you're delivering, was sourced out of state, transported, and then you engaged in the essential last-mile delivery. And now there's a local outfit affiliated with the New York Times. You're here in Denver, and the New York Times will deliver from Manhattan to this little outfit. This little outfit then takes title to the New York Times. I go pick up here in Denver those issues of the New York Times, and I deliver them locally. Am I still a transportation worker? I don't think that title matters in this context. So even though I have nothing to do with any interstate travel of these goods, just like I buy a bologna, a slice of bologna that may have been made in Idaho, and I buy it here in Denver, and then I resell it to my friend, Judge Matheson. I'm now a transportation worker just because those goods have somehow in their past history traveled interstate, but I'm just buying it locally and reselling it locally. Everybody's a transportation worker that resells anything. I don't read it that broad, Your Honor, especially for the bologna example. If I go to a grocery store, the only transaction is between myself and the grocery store. That's purely interstate. I didn't order the bologna from out of state and have it shipped to me. If I had done that, that would be— Okay, last question, and then I'll shut up. So that's why I asked about this local outfit that actually takes title, accepts the New York Times here in Denver. I'm not doing anything with anybody in Manhattan. I'm just dealing with the equivalent of that local grocery store that sells bologna. I'm just getting—instead of bologna, I'm getting the New York Times. Sure. I may have misunderstood the facts behind the hypothetical. Is the customer relationship purely with the local newspaper outlet? Yeah. I buy it here in Denver, and I resell it here in Denver. I think it's the overall transactional context. So if the customer is a Denver resident, and they're reaching out to a local Denver affiliate who happens to have New York Times papers, I don't think that would qualify under Section 1. It's a close question, but I don't think that would quite qualify. That would probably look more like the Uber or DoorDash line of cases where you have this sort of separate transaction that's purely interstate. I think what lacks here is the separate transaction. If you look at what the lower court found, first of all, for the title aspect, this is very much disputed. Flowers Hole Agreement is written to give this appearance of independence and separate businesses. The reality of these cases, for example, is this court address in the Acosta v. Janikin case, is that these are just complicated ways to essentially misclassify workers, so you don't pay them overtime, you don't reimburse their expenses, you don't pay work comp, et cetera. That's what's alleged here. And in the complaints now, I can cite specific page numbers, but we dispute very much that our client actually takes title to product or that they have a relationship with Walmart, Costco. That's Flowers Foods relationships. And Flowers Foods, under their direct store delivery business model, promises its customers that its out-of-state baked bread will get on their shelves, and they use my client as the last mile leg of that, just like the Amazon cases. And to try to distinguish Amazon as not having a separate business, they also use independent contractors. Amazon would have got up here and told you the exact same thing, which was this is a separate business, this is a local delivery company, but what they're doing is actually fulfilling a large company's last mile of their delivery operation. On that point, you brought up the concept who orders. Does it matter in this case whether Walmart orders from Brock or Walmart orders from Flowers? I think so long as the expectation is that the bread is going to end up on Walmart and Costco's shelves, that that is the transactional context is when it gets on their shelves, and which is why the bologna example would not qualify for the person walking in and buying the bread and not trying to stretch it that far. So to answer your question here, because Brock actually orders for his stores, he goes in there and says, yeah, Dave's Killer Bread was really popular this week. I'm picked over, so I'm going to order more for next week. He places that order, that's fulfilled out-of-state. It's set aside for him in the warehouse. He picks that up within hours of it arriving, whether he loads it or unloads it from the truck, I think is relatively meaningless here. And Amazon would be the same, by the way, that the Amazon drivers aren't going up to the big rig truck and pulling all of their orders. They're getting out of the warehouse, just like we do here. Would it be a stronger case if Walmart ordered from Flowers? Well, we do allege, and I think our complaint makes clear, that the actual relationship here is between Flowers Foods and Walmart. My client is getting paid by Flowers, but my client doesn't go down to Arkansas and negotiate shelf space and pricing for bread. That's an issue for Flowers Foods. But doesn't your client call up Flowers and say, the Walmart needs X loads? Yes, he does place orders for his stores and makes the inventory determinations for his local stores. He places those orders, which are fulfilled out-of-state, brought in, and he delivers it to the store. But doesn't negotiate the price. Correct. My client is not in a position to negotiate with Walmart over his one store. Specifically, Your Honor, to point you to the parts about the title issue being disputed, if you look at the complaint at paragraph 4 through 11, and again at 31 through 36, we very much dispute that my client takes title to anything. He's paid a commission for picking up and delivering bread. This whole buy-sell arrangement is just a product of them attempting to justify their misclassification and make this look fancier than it actually is. Do we need the district court to resolve that? I think there were competing versions submitted to the district court. They wanted this to look like a franchising relationship or business-to-business or independent contractor. They presented those facts to the district court, and we presented our more plain facts, which is my client runs a bread route and delivers products. And the court, I think, reviewed both of those and made factual findings, namely that they load another bakery products, and their sort of other business responsibilities don't detract from that delivery role that they carry out. They don't remove them from the transportation worker here, so I don't think there's anything to be sent back on that issue. Well, how about what you just mentioned from the complaint? I assume that's not all agreed. In terms of the title and things of that nature? Yes. Yeah, I mean, I think, again, that dispute was put in front of the district court, and she resolved the facts as she saw them. I also think at this, you know, pleading stage, if there's any doubts or issues to be resolved, then interpret it in our favor. And how did the district court resolve the title question? That's fair. I'm going down into the general business umbrella, so I don't know if she specifically mentioned title. And if that's important to us, should we remit? I think there are ample facts to support the district court's conclusions here, and I don't see the title thing as just positive. I suppose if Your Honors do, that may be worth a second look. But, yeah, just to reiterate, you know, Amazon would have said the exact same thing as my independent carriers or take the title because they're not part of my business, and that is only designed to prop up the misclassification scheme at ARPO. I'm just looking at the district court's opinion, and at one point it says independent distributors are responsible for ordering products which are then delivered to them from bakeries for sale and direct delivery to customer stores. Does that shed some light on the colloquy you've been having with Judge Phillips? I don't read that as touching on the title. I think it's undisputed that my client places the orders. He boots on the ground in his doors. He knows what inventory they need. He then places those orders and ultimately delivers the bread there. That's the overall transactional context. I don't read that as, I guess, hitting on who owns the bread at that point. In terms of warehouse ownership, that fact came up. If you look at the exhibits to the distributor agreement, my client gets to choose between three warehouses where he'll pick up the products. These are all flowers warehouses, so if you're looking for that fact in the record, it'll be one of the first two or three attachments to the distributor agreement itself. I'm interested in this other issue that we took up, but I don't want to go there. If you've got any other points on the interstate commerce issue. I did just briefly want to highlight a couple of additional facts relating to just how continuous this is. I think counsel was emphasizing the fact that there's a splitter at the local warehouse which takes the products off the big 18-wheel truck and puts it at everyone's cubby for them to come pick up hours later. I don't think a small passage in time in the context of fresh product delivery where this is really essential to get these on the store shelves as quickly as possible matters or whether my client directly walked up to the 18-wheel truck or simply waited for it to be set aside for them in the warehouse. This is a very continuous movement of these goods, and specifically in the Charles Bridge declaration that we submitted along with our moving papers, flowers, and other contexts that describe this as a nearly continuous movement from origin to destination. I think that's very important here. My client picks this up hours after it's delivered from out of state. The whole point is getting fresh product on the shelves, and I think that sheds lights on this as well. That site is the appendix at page 272. Turning now to the contracts and employment issue which was developed for the first time here on appeal. This case looks nothing like Amos or Fly Low or Tillman. We have a single owner-operator in this case who is directly alleging a misclassification claim and that there is an employment relationship here. When you say single owner-operator, does the record show that it's just him, or does he have employees? What's the setup? That's fair. There is no record of him having employees. We would have developed more facts surrounding this issue if it was brought up at the district court, namely that my client runs this route himself. He does not have hundreds of employees working under him. Could he hire a manager and say, I'm going to sit at home and watch Netflix, and you, the manager, are responsible for delivering these goods? That is hypothetically possible under the distributorship. He has no obligation to do anything personally like a railroad worker or a seaman. I would disagree with that, Your Honor. There is a personal guarantee that's attached to his existence. So he has to personally guarantee that he is going to either do it or have somebody else do it. And so if I am running a naval shipyard and I guarantee that I am going to hire Judge Matheson as my seaman, okay, Judge Matheson is going to be doing the personal work required for a seaman. I am a guarantor, but I am not obligated to do anything on my own as a guarantor, right? Well, you are obligated if the service isn't performed. You are personally responsible for that. And I'd also point that it's not just the descriptions or contracts that define the class of workers and what they engage in. For example, in Saxton, we have a ramp agent supervisor. If you look at her title and sort of engage in hypotheticals, she could just sit back and watch the workers perform work and she wouldn't touch any goods. But the Supreme Court found that you look at what they actually do, and they credited her testimony that up to three shifts per week, she's actually going and pulling these bags off the shelves, which is the exact testimony we have here, which is that my client and his fellow distributors are the ones who show up night in and night out, pick up these products and take them out for delivery. So I don't think we're confined to, and again, I direct the court that in this context of a misclassified worker, you'll often see these things where you'll say you have all these freedoms in the world, but this personal guarantee makes sure that if I need bread on Walmart shelves at 6 a.m., I'm waking Mr. Brock up and telling him to get down there and take care of that issue. And so I think that's an important factor to take in mind in addition to the plain text of the agreement. Well, if we did reach the issue, your opposing counsel says that this is pure question of law. It's an issue that getting some clarity would be worthwhile. But I guess my question to you, based on what you just said in response to Judge Bacharach, is, is it a pure question of law? Wouldn't we need to know more about the business? And is it just Mr. Brock? What does the personal guarantee and his signing the arbitration agreement mean? Wouldn't the district court have to develop some facts on the issue in order to address this question? I think we would have developed the facts somewhat differently. I will say, on the other hand, I think based on the testimony in the record, we know that there's a natural individual who's tied to this contract, which is very distinct from the Amos-Flywell line of cases where the natural individual doesn't sign the agreement. He isn't bound by it. Most notably here, if you look at Exhibit K to the distribute agreement, which is the arbitration section, my client signs that in both his business capacity and in his personal capacity. And that agreement itself attempts to send his employment claims to arbitration. And if you look at Circuit City and New Prime, the whole congressional intent behind the Section 1 carve-out was to ensure that employment claims by transportation workers, natural individuals, don't end up bound up in the FAA. So I think that runs this full circle there, to them essentially running around the FAA through their argument here. And I would also note that there is no record of, you know, for example, in Amos that they operated an entire Amazon region. They had 450 employees. And so I think there was somewhat of a, you know, a smell test done by these district courts to say, sure, Mr. Amos makes an employment claim, but is someone that employs 450 workers under him, you know, really an employee here? And they kind of carved out, I think, a room for a case just like this, where the corporation is mere window dressing, in Amos' words, or is a nominal party to the overall contract. And so I think, you know, that there is room for course correction, frankly. I think the facts that have found their way up to these other circuit courts have been very unfortunate for plaintiffs. I don't know why someone would pursue a transportation worker argument when they have 450 workers under them, where their corporation is legitimate, et cetera. Thank you, counsel. Do you have anything to add? Do you mind if I ask? I know we're way out of time. Go ahead. I just really want to ask about something that you guys briefed extensively, but really I don't think it's talked about at all yet, and that's Colorado law. Does the FAA bar other laws from forcing transportation workers to arbitrate? The FAA does not preempt state laws that want to force transportation workers to arbitrate. The problem for Flavio's here is the plain language agreement. Okay. But there's nothing about the FAA itself that would bar either a federal law or a state law from forcing people to arbitrate. I agree with that.  And so in Section 1 just says nothing herein, and I guess that's because all Section 1 says is nothing herein shall apply to the transportation worker exception. So there's really nothing in Section 1 that would prevent the applicability of Colorado law requiring transportation workers to arbitrate. I agree with that. I think the issue that's a little more picked up on than we argue for here is that by tethering Colorado law to be consistent with the FAA, you can't, because the FAA does not compel transportation workers to arbitrate. Yeah, and that doesn't really make any sense, does it, based on what you just said? Judge Sweeney, and you seem to be at odds, Judge Sweeney seems to think that Section 1 does prevent another law from forcing transportation workers to arbitrate. You said today, and on page 36 of your response brief, that it doesn't, because Section 1 doesn't prevent, that explicitly doesn't prevent another law from forcing transportation workers to arbitrate. It just says nothing herein shall apply. So how can Judge Sweeney possibly be right in saying that this provision that doesn't apply to transportation workers, that doesn't prohibit other laws, federal or state, from forcing transportation workers to arbitrate, how in the world can Colorado law be inconsistent with Section 1? I can't fathom how what you're saying is consistent with what Judge Sweeney said. I didn't read Judge Sweeney's order as being sort of preemptive in scope. I don't think she's saying Section 1. Well, you're the one that keeps using the word preemptive. Section 1 doesn't use the word preemption, and Judge Sweeney didn't. She said that it is inconsistent, and you just got through telling me that it's not inconsistent. Section 1 carves out transportation workers from arbitration obligations. To be consistent with that under Colorado law, you also have to carve out transportation workers from arbitration obligations. Even though Section 1 doesn't prohibit state law for forcing transportation workers to arbitrate. I don't think it's about prohibiting. It's about carving them out. If you're going to be consistent with Colorado law, you occur. Okay, let me ask you a hypothetical. Let's say there is a law that says in the private sector an employer cannot discriminate against an employee on the basis of race, sex, or religion. Okay? And then there is a state law that says in state government an employer cannot discriminate against an employee on the basis of sex, race, or religion. Are those two inconsistent? The first one obviously carved out anybody other than private sector employers. So are those inconsistent? If this was purely a question of what Colorado law could do in a vacuum without any of the plain language agreement applying, I agree with you. I don't know what you're talking about. I'm just talking about my question. So you have two different introductory clauses. One for the private sector, one for state government. Are those two laws inconsistent? State laws are free to fill gaps where federal law leaves questions open. So yes, I agree with that. It just depends on the wording of the contract here. Okay. Last question. I'm sorry I'm monopolizing so much time. On the impendent appellate jurisdiction. So Judge Sweeney, as I understand it, said the opposite of what I'm suggesting, and that is that state law is inconsistent with Section 1, right? It's inconsistent in that it's broader than Section 1. Right. That it's inconsistent. Well, if we have to decide whether something is consistent or inconsistent with Section 1, doesn't that by definition mean that our inquiry is inextricably intertwined with the very basis of Judge Sweeney's ruling? I agree that if you're going to analyze what the FAA would permissibly allow here that it's bound up. My point in making the appellate jurisdiction argument was that I think what they're saying is ignore all references to the FAA and the contract and just focus on Colorado law. I think that was their lead argument essentially. Okay. That's fair. But if we do, in the context of our inquiry under Colorado law, address the merit of what Judge Sweeney said, you would agree that there is pendent appellate jurisdiction. Correct. Thank you for being with me and thank you, Judge Mathis. Thanks very much. All right. I think you're going to get some extra time. I tried bargaining this. You're a good negotiator. Why don't we put up, just so we have a target, why don't we put up four minutes and we'll see how it goes on the condition that you at least do a little bit with this pendent jurisdiction issue. I can start wherever you all want me to start. I was going to just do it. I'll start on pendent. Do it. Whatever you say. It's your argument. I can very quickly clear up the record on title and the district court's findings just for your benefit. The district court didn't make a specific finding on title, but what the district court did do, and that's at the end of page two, which Judge Mathis and you were reading, was agreed that Brock is a business and Mr. Brock has customers and they are his own customers and he's making sales and he's making orders. And I think for all intents and purposes, that's exactly the same as a title finding because you can't have your own business with your own sales if you don't have title to the thing that you're selling. Did it resolve that as fact or is it simply parroting what the agreement says, which, of course, Brock says that's not how it is in real life. I mean, to be candid with you, I didn't read the district court's factual findings, but it's sort of stipulating that this is how I'm reading the agreement. And so I think that this decision is based on the assumption that Mr. Brock has a business and that Brock is a real business with title changing. And I think as the appellate court, you can review it on that sort of assumption that the district court made. And that's also, if you want to, it's Addendum 2 and ABD 5, Section 4.1, is the title change provision. I'll circle back to contracting employment, but very quickly to get to the state court issue. I mean, we do agree that this could be decided under state law. There are cases going back from 1925 that hold that arbitration under state law is consistent with the FAA. And just as a historical fact, the Seamen lost their federal arbitration right in 1925, and since 1925, Seamen have been arbitrating under New York law. And there are special arbitration proceedings for appellatee under New York law because you can now arbitrate under state law and there's no federal remedy for Seamen otherwise. So you'd be doing violence to about 100 years of practice in appellatee law to say that they're inconsistent. I think what the court was focused on, to be fair to the district court, was this language of exclusive as it was used in the redistribution agreement. And I think the council was wise not to go there because if you look at the agreement, and this is at A84, exclusively it's modifying arbitration. The sentence is, arbitration agreements, and now I'm quoting, shall be submitted to and determined exclusively by binding arbitration. And then there's a prepositional clause that starts with under the FAA, but the district court put a period there. Actually, that sentence goes on and it ends with except as otherwise agreed to by the parties and or specified herein. So exclusively saying it's exclusively arbitration and it's under the FAA or as agreed by the parties herein. So the FAA is not exclusive, and I think the council abandoned that grounds and now he's sort of backed into this position of inconsistency, and that is flatly inconsistent with almost 100 years of how FAA and state law have been treated in practice. To bounce back to contractual employment, I do want to address, Judge Matheson, your concern that Amos and Flyfo and Tillman aren't addressing this legal question. And I point you to two aspects. Just to be clear, my question is, do we need more factual development to address the question? And let me take that spot on. My answer is no, because this is a textual. First, what Amos is doing is from the text of Section 1. There's two holdings in Amos. Let me just throw one thing out. I don't know what the record shows on this. We've got Brock Inc. and we've got Brock. Is Brock Inc. just Brock? No, and I think that you can— Why not? How do we know that? We know that from the text of the agreement. But do we know it as a fact? I think we know it as a fact, and that's from— No, you just said the text of the agreement. Is there anything in the record to show one way or the other whether Brock Inc. is just an alter ego for Mr. Brock? Well, the agreement's in the record, and you can't have allegations that are flatly inconsistent with the exhibits attached there, too. I understand it's in the record. Do we have any facts, though, about his business? About his business? Yes. Only that which the district court said that he— But was there any factual development in the district court about his business? About his business, not beyond the four quarters of the agreement. Okay, fine. Don't we need that to address this issue? Because this is a threshold question under Section 1. I think that counsel has done a very effective job of merging the merits of the FFLSA claim, which have to do with the zero sham, it's the Acosta analysis. Those are all issues for the arbitrator. The Section 1 issue is a threshold question of whether or not you have a contract of employment within the terms of Section 1. Well, how would you respond to his response to the 28J letter in which he pointed out that Mr. Brock signed a personal guarantee and signed the arbitration agreement in his personal capacity? Isn't that some indication that all we're dealing with is Mr. Brock? No, I mean, guarantees are common. And if you look at the guarantee— Was there a guarantee in Amos? That's not in the record. I don't know. But I can tell you— Was there one in the other cases? I don't know. Well, we don't know. And you're asking us to make laws a matter of first impression when we don't have that information. But I don't think you need it. Because on the terms, the text of the guarantee here, which is at A79, the only thing that Mr. Brock is personally guaranteeing is the performance of Brock, Inc. And if you look at the distribution agreement at A64, Section 16.2, Brock, Inc. is allowed to structure its business however it wants. And, again, we're not under Section 1. You're not looking at Brock. You're looking at the class of workers. And the distribution agreement is telling you that this class of workers, this business can make itself up however it wants to. They can hire employees. When you said, when you're looking at Brock, are we looking at Mr. Brock or are we looking at Brock, Inc.? When you're looking at either, you're looking at the class of workers. It's not just Brock or Brock, Inc. It's not just this agreement, but it's this class of workers, these wholesale distributors. And they have the freedom to hire whomever they want. There's no personal service guarantee at all. This is not me to put it bluntly. Brock, Inc. is Flowers' customer. Flowers isn't buying anything from Brock, Inc. And that's how this distribution agreement is set up. It's completely unlike a personal services agreement. And I think you can look to this agreement. It's structured as a business-to-business agreement. There's no argument on the face of the agreement that there's a sham. There's no compensation. There's no employment requirement. There's no personal service requirement. And so I think these arguments of sham are really going to the merits of the Acosta case. Well, wait a minute. Wait a minute. Who made a sham argument? Pellington. How did? I've not seen that. Did he ever use that word? I thought he did when he was talking about the Acosta case. And he said, you know, businesses are setting up these kinds of agreements to make it look like they're contributing to contractors when they're not. I'm sure he didn't mean that as his sham agreements. And I think those are all Acosta cases. Well, I mean, I just don't want to put words in his mouth, and I don't think you do either. But is that really the argument? Did he make that argument? I thought he was making the argument that you need fact-finding on. Well, I asked that. I asked that, and I think he said yes. And you disagree. I disagree. I don't think you need fact-finding. Okay. I understand your point. We're now over the overtime. In soccer terms, I think we're in overage. Is that right? Is that right? So if you could take maybe, I don't know, 30 seconds to wrap up. I would just point you to, on this issue, to VisaNet, which says at 254, the Section 1 analysis should not read litigation that FAA seeks to avoid. These are threshold questions that you should be able to determine on the face of the agreement, and all of them are answered. And I do think you can answer these questions without engaging in a circuit split, both because of the way this specific agreement is structured, the state law issue, and the contractual employment issue. Thank you for your indulgence. I really appreciate it. Thank you to both of you. We appreciate the arguments, and it was good to have some extra time to flesh some of this out. So thank you very much. The case will be submitted and counselor excused.